**SO ORDERED.**

**SIGNED this 23 day of August, 2011.**

_____

**Randy D. Doub**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:

                                            **CHAPTER 11**

**SUD PROPERTIES, INC.,**                    **CASE NO. 11-03833-8-RDD**

        **DEBTOR.**

### ORDER DENYING CONFIRMATION OF
### CHAPTER 11 PLAN OF REORGANIZATION

Pending before the Court is the proposed Plan of Reorganization[1] filed by SUD Properties, Inc.

(the "Debtor") on May 18, 2011, and the Disclosure Statement filed by the Debtor on May 18, 2011,

the Bankruptcy Administrator's Response to Debtor's Plan of Reorganization and Disclosure

Statement filed by the Bankruptcy Administrator on July 14, 2011, and First Bank's Objection to the

Debtor's Disclosure Statement, Chapter 11 Plan of Reorganization, Amended Treatment for Class 4

and Class 5 of the Plan of Reorganization and Incorporated Memorandum of Law in Support of

Objection, filed by First Bank, as successor to Cooperative Bank, on July 15, 2011.  The Court began

_____

[1]The Debtor filed its proposed plan of reorganization on May 18, 2011 and filed the
Amended Treatment for Class 4 and Class 5 of the Plan of Reorganization on June 28, 2011 (the
"Plan").

a hearing in Wilson, North Carolina on the confirmation of the Plan and final approval of the Disclosure Statement and the responses thereto on July 22, 2011.[2]

## BACKGROUND

The Debtor filed a second petition for relief under Chapter 11 of the Bankruptcy Code on 17, 2011. The Debtor is a North Carolina corporation engaged in the business of owning and developing real estate. Vernon D. Danford is the sole owner and manager of the Debtor. In July of 2005, the Debtor was formed. Its sole project was to develop a tract of land in Brunswick County, North Carolina known as "Springstone Subdivision" located at 211 Lanvale Road, Leland, North Carolina (the "Property"). The Debtor began developing the Property in 2005 and by 2006 eighty-eighty (88) lots were platted with completed infrastructure. Amenities in the "Springstone Subdivision" were to include a clubhouse and pool. However, to date, the clubhouse and pool have not been built. Through the years, the Debtor sold eighteen (18) lots to various buyers. The decline in the real estate market made it difficult for the Debtor to continue selling lots and, as a result, the Debtor defaulted on its financial obligations.

Today, the Debtor owns seventy (70) lots. All roads and utilities have been installed at the subdivision. The Debtor's schedules list the value of the Property as $2,720,000.00. The Debtor has designated this case as a single asset real estate case as defined in 11 U.S.C. § 101 (51B).

First Bank holds two promissory notes executed by the Debtor and secured by first and second deeds of trust on the Property. On July 20, 2011, First Bank filed a proof of claim in the amount of

---

[2]The hearing commenced on July 22, 2011 and additional testimony was presented on July 29, 2011, August 5, 2011 and August 16, 2011.

$1,349,910.13.[3]  The Property is also subject to a third deed of trust in favor of Springstone Properties, LLC, an entity owned by the principal of the Debtor.  As of the petition date, the balance of this insider claim, including interest, was approximately $3,960,000.00.

The Debtor defaulted on each of its loan obligations to First Bank.  Both of the loans have fully matured.  First Bank initiated foreclosure proceedings on the notes secured by the Property.  On May 5, 2010, the eve of the foreclosure sale, the Debtor filed its first voluntary Chapter 11 petition, docketed as Case No. 10-03622-8-RDD.  The Debtor's first plan of reorganization (the "First Plan") was confirmed on October 1, 2010 upon the entry of the Order Confirming Plan (the "Confirmation Order"). The First Plan proposed to satisfy First Bank's indebtedness from the sale of lots in the Springstone Subdivision.  The First Plan provided a schedule whereby the Debtor was to sell a certain number of lots within certain time parameters to D.R. Horton Homes, Inc. a nationally-known home builder.  The schedule provided that all seventy (70) lots were to be sold by January 31, 2014. In exchange for the treatment of First Bank's claims in the First Plan, First Bank was to "withdraw its Motion for Relief, withdraw its Objection to Sale, withdraw its Objection to Confirmation and amend its ballots to accept the Plan."  Additionally, the First Plan required First Bank to dismiss the pending foreclosure proceeding, without prejudice, and, in the event of the Debtor defaulting under the terms of the Confirmation Order, "[n]o future bankruptcy filing by any party shall stay a foreclosure proceeding brought by First Bank against the Springstone Subdivision relating to the First Bank Indebtedness."

The Debtor was unable to sell the lots in accordance with the schedule set forth in the First Plan because D.R. Horton Homes, Inc. was unable to close the transaction.  Accordingly, the Debtor

---

[3]Testimony at the August 16, 2011 hearing revealed the claim balance including costs for attorneys' fees, appraisers, and interest was approximately $1,450,000.00.

defaulted under the terms of the First Plan.  The Debtor filed a Motion to Dismiss the first case.  This motion was granted and the case was dismissed on April 19, 2011.

Upon the Debtor's default, First Bank initiated foreclosure proceedings against the Property for a second time.  The foreclosure hearing was scheduled for May 17, 2011 in Brunswick County, North Carolina.  One hour prior to the foreclosure hearing on May 17, 2011, the Debtor filed a second petition for relief under Chapter 11 of the Bankruptcy Code.  Clayton Cheek, counsel for the Debtor; Mr. Danford; and Justin M. Lewis, counsel for WASLAW, LLC, the substitute trustee under the deeds of trust, appeared at the foreclosure hearing before the Assistant Clerk of Court in Brunswick County (the "Clerk").

At the foreclosure hearing, counsel for the Debtor requested a continuance for sixty (60) days.  The Clerk continued the hearing for sixty (60) days and entered an order on June 3, 2011, continuing the foreclosure hearing until July 18, 2011.  The foreclosure sale was scheduled to occur on August 17, 2011.

On June 8, 2011, First Bank filed a motion to dismiss the Debtor's case for "cause" pursuant to 11 U.S.C. § 1112(b)(1).  The Debtor filed a response in opposition to the motion to dismiss on June 28, 2011.  On July 20, 2011, the Court entered an opinion denying First Bank's motion to dismiss.

The Debtor's Statement of Financial Affairs discloses the Debtor received no income from 2010 to present.  On Schedule B, the Debtor represented that $266.98 is held in a RBC checking account.

Debtor filed its proposed plan of reorganization (the "Plan") on May 18, 2011 and filed the Amended Treatment for Class 4 and Class 5 of the Plan of Reorganization on June 28, 2011.

First Bank's total secured claim is secured by a first and second deed of trust on the Property.  First Bank's claim is treated in Class 4 of the Plan.  The Plan provides that First Bank's claim is to be satisfied in exchange for a portion of the Property or "dirt" in full satisfaction of the debt owed to First

Bank. Specifically, the Debtor proposes to surrender to First Bank thirty-two (32) of the seventy (70) lots in full satisfaction of First Bank's claim. The Plan details that the lots to be conveyed consist of lot numbers 1-13, 30-35, 36-48 as shown on map entitled "Final Plat SPRINGSTONE" recorded in Map Book 39 at Pages 68-70 of the Brunswick County Registry.

In the alternative, the Plan provides that if the Court determines that the per lot value shall include a discount for entrepreneurial profit, the Debtor proposes to surrender thirty-five (35) lots in full satisfaction of First Bank's secured claim. The Plan provides that under the alternative arrangement the lots to be conveyed consist of lot numbers 1-13, 30-37, 38-49, 55 and 56 as shown on map entitled "Final Plat SPRINGSTONE" recorded in Map Book 39 at Pages 68-70 of the Brunswick County Registry.

Additionally, Mr. Danford testified that the Debtor would not list any of the retained lots for sale at a price less than $45,000.00.  Therefore, he believed his list price would not be in direct competition  with First Bank.  Furthermore, the Debtor provides that the personal guaranty of Mr. Danford will not be extinguished as part of the dirt-for-debt exchange.

### STATEMENT OF THE CASE

First Bank objects to the Plan and Disclosure Statement for the following reasons: (1) the Debtor does not provide sufficient information about how it can implement the Plan and, in fact, omits critical information; (2) the Plan represents an impermissible attempt to modify the Debtor's previously confirmed plan in the First Case in violation of Section 1127(b); (3) the Plan improperly prefers equity holders; (4) the Plan is not feasible; (5) the Plan does not provide First Bank with as much as it would receive in a liquidation; (6) the Plan is not fair and equitable to First Bank; and (7) the Plan was not proposed in good faith, but was instead proposed for the improper purpose of circumventing the time restrictions and other limitations as set forth in Section 1127(b).

The Bankruptcy Administrator's Response provides a synopsis of the proposed treatment of First Bank's claims. The Bankruptcy Administrator (the "BA") contends that Springstone Properties, LLC, Danford & Associates, and V. Derek Danford are insiders of the Debtor as defined by 11 U.S.C. § 101(31) and that the votes of these creditors should not be considered as satisfaction of 11 U.S.C. § 1129(a)(10). Additionally, the BA contends that the votes of Hinson & Rhyne, P.A. and Saffo Law Firm should not be considered as these creditors were previously attorneys for the Debtor. These creditors have or had a fiduciary relationship with the Debtor and are "non-statutory insiders" of the Debtor. The BA notes the Plan is a partial "dirt for debt" plan and that hypothecating a value of real estate, especially in one of North Carolina's worst real estate markets, does not satisfy the indubitable equivalent standard as required by 11 U.S.C. § 1129(b)(2)(A)(iii). The BA contends that the best evidence of the value of the lots would be to employ a real estate agent, market and sell a lot, and let the current real estate market in the Wilmington area determine the value. In addition to the objection regarding the partial "dirt for debt" plan, the BA contends that the Plan is not feasible.

The Debtor contends that the lots it proposes to convey are of sufficient value to be the indubitable equivalent of First Bank's claim.

For the reasons set forth below, the Court finds that the Debtor has failed to prove that its proposed treatment of First Bank provides First Bank with the indubitable equivalent of the secured claim. Under the Plan, First Bank will not receive the indubitable equivalent of its claim. Because the Court finds that the claim of First Bank does not receive fair and equitable treatment under 11 U.S.C. § 1129(b)(2)(A)(iii), First Bank's additional objections need not be addressed.

## DISCUSSION

In order for the Plan to be confirmed, the Plan must meet the requirements of Section 1129 of the Bankruptcy Code. Since First Bank has voted against the Plan, 11 U.S.C. § 1129(b) must be

6

satisfied before the Debtor is permitted to "cram down" First Bank's claim.  Therefore, the Plan must not "discriminate unfairly" and must be "fair and equitable" pursuant to section 1129(b)(2).  If the Debtor is able to meet these requirements, the Debtor can "cram down" the claim of First Bank and the Court could confirm the Plan over First Bank's objection.  To be "fair and equitable" the Plan must provide First Bank with the indubitable equivalent of its secured claim. 11 U.S.C. § 1129(b)(2)(A)(iii).

In order to determine whether value exists to satisfy the indubitable equivalent requirement for a "cram down", the specific facts of each case should be considered and the litigants should "focus [their] evidentiary presentations on the value of the surrendered property." *In re The Legacy at Jordan Lake*, *LLC*, 448 B.R. 719, 723 (Bankr. E.D.N.C. April 14, 2011) (citing *In re Bannerman Holdings,LLC*, 2010 WL 4260003 at *8 (Bankr. E.D.N.C. Oct. 20, 2010)). Before addressing the issue of whether the Plan provides the indubitable equivalent of First Bank's claim, the Court must first determine the burden of proof the Debtor must satisfy.

Judge Learned Hand coined the phrase "indubitable equivalence" in the case of *Met. Life Ins. Co. v. Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935).  There, Metropolitan Life Insurance Company held a secured claim of approximately  $400,000.00 on an apartment building valued at $540,000.00. *Id.* at 941-42.  The debtor's plan proposed to pay the secured creditor interest only on the apartment building for a period of ten years, with the full balance due at the end of the ten year period.  *Id.* at 942. The proposed plan did not provide for amortization of principal or for maintenance of the apartment building over the ten year term.  *Id.*   The Second Circuit explained:

> It is plain that adequate protection must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now.  Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, *unless by a substitute of the most indubitable equivalence.*

*Id.* at 942 (emphasis added).  This holding was later codified in 11 U.S.C. § 1129(b)(2)(A)(iii) of the Bankruptcy Code which states in pertinent part:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides-
> (iii) for the realization by such holders of the *indubitable equivalent* of such claims.

(emphasis added).

The legislative history of 11 U.S.C. § 1129(b)(2) provides guidance as to what constitutes the indubitable equivalence of a secured claim:

> [a]bandonment of the collateral to the creditor would clearly satisfy indubitable equivalence, as would a lien on similar collateral.  However, present cash payments less than the secured claim would not satisfy the standard because the creditor is deprived of an opportunity to gain from a future increase in value of the collateral.  Unsecured notes as to the secured claim or equity securities of the debtor would not be the indubitable equivalent.

H.R. Rep. 95-595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6544.  Therefore, plans proposing to surrender all of the property to which its lien attaches are "fair and equitable" and the creditor receives the indubitable equivalent of its secured claim.  *See In re Bannerman Holdings, LLC*, 2010 WL 4260003 at *3; *Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1350 (5th Cir. 1989) (noting that "common sense tells us that property is the indubitable equivalent of itself"); *Arnold & Baker Farms v. U.S. (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1423 (9th Cir. 1996), *cert. denied* 117 S.Ct. 681 (1997).

Plans which propose to surrender only a portion of the collateral in satisfaction of the secured claim are much more controversial and more difficult to confirm.

Merriam-Webster Dictionary defines "indubitable" as "too evident to be doubted: unquestionable." Merriam-Webster Online Dictionary, www.merriam-webster.com. (last visited Aug. 23, 2011);  *In re Walat Farms, Inc.* 70 B.R. 330, 334 (Bankr. E.D. Mich. Feb. 9, 1987).  Equivalent

means "equal in force or amount" or "equal in value." *In re Philadelphia Newspapers, LLC et al.*, 599 F.3d 298, 310 (3d Cir. 2010) (citation omitted).

Courts have applied varying evidentiary standards when analyzing the indubitable equivalent required by 11 U.S.C. § 1129(b)(2)(A)(iii). *In re Bannerman Holdings, LLC*, 2010 WL 4260003 at * 3 (Bankr. E.D.N.C. Oct. 20, 2010) (citations omitted) (determining that because "even the higher 'clear and convincing' standard [of proof was] satisfied," the court need not consider whether the appropriate evidentiary standard should be the clear and convincing or the lower, preponderance of the evidence standard.).

Some courts have found that the burden of proof must be established by "clear and convincing evidence." *In re Agawam Creative Mktg. Assocs. Inc.*, 63 B.R. 612, 618-619 (Bankr. D. Mass. 1986) (stating that [t]he plan proponents have the burden of proving satisfaction of each of the requirements of section 1129(a) . . . and the burden of proving that the plan meets the fair and equitable standards of section 1129(b)(1) by clear and convincing evidence" (citations omitted)); *In re Birdneck Apartment Assocs., II, L.P.*, 156 B.R. 499, 507 (Bankr. E.D. Va. 1993) (stating that "before a plan can be 'crammed down' over the objection of a dissenting creditor the debtor must establish by clear and convincing evidence that the plan is fair and equitable." (citations omitted)).  The bankruptcy court for the Western District of North Carolina found that the "burden is more than a mere preponderance of the evidence and more than even beyond a reasonable doubt, but rather the indubitable equivalence of cash payment on the date of confirmation."  *In re Prosperity Park, LLC* 2011 WL 1878210 at * 4 (Bankr. W.D.N.C. May 17, 2011) (citing *In re B.W. Alpha, Inc.*, 100 B.R. 831, 833 (Bankr. N.D. Tex. 1988)). The burden is "akin to a clear and convincing standard." *Id.*

Other courts have applied the preponderance of the evidence standard and determined that the debtor only needs to prove the plan provides the creditor with the indubitable equivalent of its claim

9

by a preponderance of the evidence. *In re May*, 174 B.R. 832, 840 (Bankr. S.D. Ga. 1994) (citations omitted). When determining "fair and equitable" treatment under 11 U.S.C. § 1129(b), a debtor must demonstrate proof by a preponderance of the evidence. *In re Atlanta S. Bus. Park, Ltd.*, 173 B.R. 444, 447-48 (Bankr. N.D. Ga. 1994).

Analyzing partial "dirt for debt" plans requires a two-step process. The analysis "distinguishe[s] between the preponderance standard that pertains to value and risk determinations, and the stringent indubitable equivalent standard that courts must apply to conclude that a secured creditor will realize the full value of its secured claim." Robert M. Fishman, Gordon E. Gouveia & Kimberly Bacher, *Revisiting the Indubitable Equivalent Standard: Undoubtedly the Same or Close Enough?*, 20 Norton J. Bankr. L. & Prac. 4 Art. 1 at 7 (2011). There is "inherent difficulty in satisfying the indubitable equivalent standard. If any doubt exists, the plan should not be confirmed." *Id.*

**Valuation:**

The first step requires the court to consider the specific facts of each case. Counsel should "focus [their] evidentiary presentations on the value of the surrendered property. *In re The Legacy at Jordan Lake*, *LLC*, 448 B.R. 719, 723 (Bankr. E.D.N.C. April 14, 2011) (citing *In re Bannerman Holdings,LLC*, 2010 WL 4260003 at *8 (Bankr. E.D.N.C. Oct. 20, 2010)). Many courts when valuing collateral in "dirt-for-debt" plans have taken conservative approaches. *Id.* (citation omitted). "[V]aluation is not an exact science, and the chance for error always exists. A conservative approach should, therefore, be taken in order to protect the secured creditor in this regard." *In re Bannerman Holdings,LLC*, 2010 WL 4260003 at *4 (Bankr. E.D.N.C. Oct. 20, 2010) (quoting *In re Simons*, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990)). The valuation process is made more difficult in uncertain real estate conditions. *See In re May*, 174 B.R. 832, 840 (Bankr. S.D. Ga. 1994) (noting that "[i]ndeed, the very professionals whose job it is to determine real estate values, real estate appraisers, cannot be

certain that the value they place on a piece of property is the price that the owner will receive for it on the open market.")

The bankruptcy court for the Eastern District of North Carolina has utilized a "three-step valuation process" to be used in dirt-for-debt cases. *In re Bannerman Holdings,LLC*, 2010 WL 4260003 at *4 (citing *In re Fazekas*, No. 92-02262-8-JRL at 7 (Bankr. E.D.N.C. May 17, 1993)). In *Fazekas*, the creditor held a secured claim in the amount of $530,616.40 on five parcels of land. *In re Fazekas*, No. 92-02262-8-JRL at 2 (Bankr. E.D.N.C. May 17, 1993). That debtors' plan proposed to convey to the creditor three of the five parcels in full satisfaction of the secured claim. *Id.* at 4. The main issue before the court was "whether the three properties that the debtors propos[ed] to convey [were] of sufficient value to be the indubitable equivalent of the [secured creditor's] claim." *Id.* at 6. At the outset of its valuation analysis, the court recognized that the fair market value of the property "must be discounted to reflect, the time each property will remain unsold, the cost to [the creditor] of retaining an illiquid investment during this time, and the risk inherent in this transaction." *Id.* at 6. The court then applied its "three-step valuation process": (1) determine the fair market value of the property; (2) reduce the fair market value of the property by 10% to reflect the costs which the secured creditor is likely to incur in liquidating the properties; and (3) apply a discount rate to the net value of each property to reflect costs associated with the secured creditor's loss of the use of its money during the time that the property remains unsold. *Id.* at 7-8. Using this analysis, the court valued the three properties with a present value of $404,655.66. *Id.* at 9. Based on this valuation, the court found that it was "abundantly clear" that the conveyance of the three lots was not the indubitable equivalent of the claim. *Id.* at 9.

In this case, the Debtor and First Bank presented extensive testimony regarding the value of the Property. E.W. Merritt, Jr., N.C. State Certified General Real Estate Appraiser, testified as to his

11

valuation on his most recent appraisal of the Property dated June 1, 2011.  He valued the seventy (70) vacant residential lots located in the Springstone Subdivision at $3,005,000.00, including a discount for entrepreneurial profit, and valued the lots at $3,370,000.00, not including a discount for entrepreneurial profit. First Bank presented testimony from two appraisers.  Hector R. Ingram, Member Appraisal Institute ("MAI") appraiser, testified as to his valuation on his Restricted Use Report, dated August 2011 with an effective valuation date of June 1, 2011.  Based on his analysis of market data and his visit to the Springstone Subdivision, he estimated the market value of the Property at $1,400,000.00. James W. McNeill, Jr., MAI, Senior Residential Appraiser, testified as to his most recent Appraisal Report dated July 9, 2011.  As of July 9, 2011, he valued the Property at $1,600,000.00.

Both Mr. Ingram and Mr. McNeill utilize an entrepreneurial profit discount, because there must be some monetary incentive to attract a buyer for a large number of lots where the pool and clubhouse have not been completed.[4]  Mr. McNeill also testified as to his valuation in his Appraisal Reports dated August 23, 2010 and July 25, 2009.  In the August 23, 2010 Appraisal Report he valued the Property at $2,000,000.00.  In the July 25, 2009 Appraisal Report he valued the Property at $3,300,000.00.  The Court gives little weight to values in older appraisals, except to corroborate a substantial decline in the market.

---

[4]In the article Subdivision Development: Risk, Profit, and Developer Surveys, Tony Sevelka, MAI states "[p]rofit foregone by the developer remains to be earned by the passive-investor interim purchaser for accepting the marketing risk of selling the inventory of finished lots at the expected retail prices to house builders within the anticipated absorption period.  In order for an interim purchaser acquiring a completed subdivision to accept the marketing risk and attendant holding costs, sufficient profit must be available from resale to builders.  The amount of profit on resale of the lots to house builders will depend on how quickly and at what price levels the inventory of finished lots can be resold." Tony Sevelka, *Subdivision Development: Risk, Profit, and Developer Surveys*, The Appraisal Journal, summer 2004 at 246 (citations omitted).

The real estate market in Brunswick County has declined in recent years. The Debtor has not sold a lot since April 9, 2009. Currently there are three lots for sale in "Springstone Subdivision" listed for $25,000.00 each. The Brunswick County real estate market currently has a surplus of real estate inventory, including vacant lots. First Bank and or its affiliates own over 1,000 vacant residential lots in Brunswick County. Additionally, Lanvale Forest Subdivision, located within a three mile radius of the Property, is in the process of being deeded to First Bank in lieu of foreclosure.

Springstone Subdivision lacks amenities such as a swimming pool and clubhouse, which are present in other subdivisions within close proximity to the Property. Currently, the subdivision has no planned amenities to offer buyers, while other similar subdivisions have such amenities.

The Property was valued at a low of $1,400,000.00 with a valuation date of June 1, 2011, by Mr. Ingram and a high of $3,370,000.00 with a valuation date of June 1, 2011, by Mr. Merritt. Mr. McNeill valued the Property at $1,600,000.00 with a valuation date of July 9, 2011. Mr. Merritt also valued the Property with a discount for entrepreneurial profit at $3,005,000.00. Additionally, Mr. Merritt's appraisal is based on the hypothetical condition that the amenities will be constructed as planned and in a timely manner. Mr. Danford agreed to set aside a portion of each lot/home package sale in order to fund the clubhouse and pool amenities. This was not confirmed with the builder. Mr. Merritt's appraisal employed the sales comparison approach to value and the income approach to value which employs a discounted cash flow analysis, which is a general process of analyzing period-by-period cash flows. Mr. Merritt expects that the development will sell thirty (30) lots in year one and as some of the excess residential product in the market is absorbed, he expects that the market will improve allowing an annual absorption of twenty-five (25) lots in year two and the remaining fifteen (15) lots in year three.

13

Mr. Merritt applied a 10% Annual Discount Rate, a 10% Developer' Profit Margin and a 7% Marketing and Miscellaneous Expenses discount for a total of 27% combined profit, discount and expenses for the lots to arrive at the value of $3,005,000 for the Property or $42,929.00 per lot. At the request of the Debtor, Mr. Merritt was asked to perform a discounted cash flow analysis that did not consider any entrepreneurial profit for the Property.  He valued the Property at $3,370,00.00 without an entrepreneurial profit calculated into the expense data or $48,143.00 per lot.  Mr. Merritt's appraisal used comparable sales of completed homes and applied a lot allocation percentage of twenty-five (25%) to determine the lot value. This method was heavily criticized by First Bank's appraisers as not as reliable as actual comparable sales of vacant residential lots.

According to his Restricted Use Report, Mr. Ingram valued the property at $1,400,000.00 or $20,000.00 per lot.  Mr. Ingram did not apply any extraordinary assumptions or hypothetical conditions to the appraisal.  Mr. Ingram's appraisal relied on both the sales comparison and income approach models.  The appraisal included a discount for entrepreneurial profit.  Mr. Ingram compared sales of vacant residential lots in various comparable subdivisions.  The Restricted Use Report states that "some entrepreneurial incentive is necessary to attract a passive investor to buy a group of lots like the subject."  Mr. Ingram applied a combined entrepreneurial incentive and discount rate of twenty-four (24%) and applied a further discount of $150,000.00 to account for the absence of the clubhouse and pool.  Mr. Ingram projects that as many as ten (10) lots could be sold in the first year, fifteen (15) lots in the second year, twenty (20) lots in the third year and twenty-five (25) lots in the fourth year.

Mr. McNeill's most recent appraisal values the Property at $1,600,000.00 or $22,857.00 per lot.  Mr. McNeill did not apply any extraordinary assumptions or hypothetical conditions to the appraisal.  Mr. McNeill's appraisal relied on the income approach and the direct sales comparison approach.  Mr. McNeill projects that the Property will be absorbed at the rate of 1.5 to 2.0 lots per month or

14

approximately three years.  Mr McNeill applied a 35.3% discount for entrepreneurial profit, a
$100,000.00 discount to account for the cost of building the pool and clubhouse, and a 7.8% discount
for marketing and closing costs.  All three appraisers believe the lots are sufficiently similar in order
to equate an equal value to each lot.

On the issue of valuation, the preponderance of the evidence standard applies.  Based on the
appraisals and extensive testimony presented at the hearing, the Court finds that entrepreneurial profit
should be considered based on the facts of this case.  The large quantity of lots to be transferred as part
of the Plan, the fact a clubhouse and pool must be built and further funds must be expended for
marketing, taxes and maintenance, either by the bank, or other investor, and the sorry state of the
residential subdivision lot market in Brunswick County are the facts in this case that dictate that an
entrepreneurial profit discount should be applied in order to determine the fair market value of the
Property.   Had the Court valued the Property without an entrepreneurial profit discount, such would
in essence forced First Bank to dispose of the Property through the retail marketing and sales  process
in hopes of generating sufficient cash to satisfy its claim.  In this case,  First Bank should have the
option to market in a manner it deems  in its best business judgment.  First Bank represented that it did
not intend to the sell the lots individually, but intended to liquidate the collateral at a bulk sale to allow
it to quickly realize the cash payment.

This was not the case in *Bannerman*, which involved a condominium development where all
of the units and the improvements were completed at the time of confirmation, so no entrepreneurial
profit discount was considered. *In re Bannerman Holdings,LLC*, 2010 WL 4260003 at *6.    In
*Bannerman*, the court found that Bannerman condominium development was "a superior project, in
excellent condition, with a good location and amenities not found in comparable projects."  *Id.* at 5.
In *Bannerman*, SunTrust Bank received eleven condominiums which were in excellent condition and

15

ready to be put on the market.  Here, First Bank would be receiving another thirty-five lots under the Debtor's Plan, the lots from the Lanvale Forest Subdivision in addition to the 1,000 plus lots already owned by First Bank and its affiliates in Brunswick County.

Applying the three-step valuation process to the present facts, the Court finds the present value of the seventy (70) lots is $1,750,000.00 or $25,000.00 per lot.  The Debtor's Plan proposes to surrender thirty-two (32) lots to First Bank in full satisfaction of its secured claim.  Specifically, lots 1-13, 30-35, 36-48 as shown on map entitled "Final Plat SPRINGSTONE" recorded in Map Book 39 at Pages 68-70 of the Brunswick County Registry.  The alternative option in the Plan provides that if the Court determines that the per lot value shall include a discount for entrepreneurial profit, the Debtor proposes to surrender thirty-five (35) lots in full satisfaction of First Bank's secured claim.  Specifically, the Plan provides that under the alternative arrangement the lots to be conveyed consist of lot numbers 1-13, 30-37, 38-49, 55 and 56 as shown on map entitled "Final Plat SPRINGSTONE" recorded in Map Book 39 at Pages 68-70 of the Brunswick County Registry.  Valuing the lots at $25,000.00 per lot, the value of thirty-two (32) of the Debtor's lots equals $800,000.00 and the value of thirty-five (35) of the Debtor's lots would be $875,000.00.  As an entrepreneurial profit discount should be considered in this case, the Debtor's Plan surrenders a value of $875,000.00.

**Indubitable Equivalent:**

The second step involves the determination of whether the valuation demonstrates that the secured creditor will realize the indubitable equivalent of its claim.  In other words, does the property provide the secured creditor with an equivalent that is "too evident to be doubted."  *In re Walat Farms, Inc.* 70 B.R. 330, 334 (Bankr. E.D. Mich. Feb. 9, 1987).

The Third Circuit held that "the 'indubitable equivalent' under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral."  *In re Philadelphia Newspapers,*

16

599 F.3d 298, 310 (2010) (noting that "indubitable" is defined as "not open to question or doubt," and equivalent is defined as one that is "equal in force or amount" or "equal in value.").

The Bankruptcy Court for the Eastern District of Michigan in *Walat Farms, Inc.*, found that the debtor could not "cramdown" its plan of reorganization that proposed to convey 400 acres of collateral when the creditor was secured by a 760 acre parcel in full satisfaction of its $589,000.00 secured claim. *In re Walat Farms, Inc.* 70 B.R. 330, 334 (Bankr. E.D. Mich. Feb. 9, 1987). In its analysis, the court stated:

> [W]e concede to doubts about our ability to fix the 'value' of the land in question. We need not make a pronouncement that no plan proposing the surrender of a portion of mortgaged land to a mortgagee in return for a compelled release of the lien on the remainder of the property will ever be confirmed. Suffice it is to say, however, that no matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of [the secured creditor's] claim. 'Indubitable' means 'too evident to be doubted'. *Webster's Ninth New Collegiate Dictionary* (1985). *We profess doubt on the facts of this case.*

*In re Walat Farms, Inc.* 70 B.R. 330, 334 (1987) (emphasis added). The court stated that if there is any doubt regarding whether the creditor will realize the full value of its claim, then the requirements of 11 U.S.C. § 1129(b)(2)(A)(iii) are not met. *Id.* at 335.

The Ninth Circuit addressed the issue of whether the debtor's plan, which proposed to convey a portion of the secured collateral, provided the secured creditor with the indubitable equivalence of its secured claim. *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1420 (9th Cir. 1996), *cert. denied*, 117 S.Ct. 681 (1997). There, the creditor held a claim in the amount of $3,837,618.00 that was secured by 1320 acres of land. *Id.* at 1418. The bankruptcy court confirmed the debtor's plan which conveyed 566.5 acres to the secured creditor based on the courts value of $7,300.00 per acre. *Id.* at 1421. The debtor's appraisal valued the property to be surrendered at $7,894.00 per acre. *Id.* at 1422. The creditor's appraisal, however, represented the value of the property

17

to be surrendered as an average of $1,391.00 per acre. *Id.* The bankruptcy court agreed with the debtor's valuation and valued the property at $7,300.00 per acre. *Id.* Therefore, the value of the 566.5 acres to be conveyed to the secured creditor was $4,135,450.00. *Id.*

The Ninth Circuit reversed the bankruptcy court and addressed the issue of whether "a distribution of land with an estimated value of $4,135,450 constitutes the indubitable equivalent of a $3,837,618 claim secured by 1,320 acres." *Id.* The Ninth Circuit found that the plan did not provide the secured creditor with the indubitable equivalent of its secured claim. *Id.* at 1423. The court concluded that "in order for a partial distribution to constitute the most 'indubitable equivalence,' the partial distribution must insure the safety of or prevent jeopardy to the principal." *Id.* at 1422. The Ninth Circuit noted that at the hearing, the evidence demonstrated that the "value of the real property was far from certain." *Id.* Additionally the large disparity in the values presented at the hearing, "illustrates the obvious uncertainty in attempting to forecast the price at which real property will sell at some uncertain future date." *Id.* At the hearing, the debtor's appraiser represented that because of unfavorable marketing conditions, including the fact that 19,000 acres of land was acquired near the debtor's property and the owner was considering bulk sale offers at no more than $2,105.00 per acre, the one year period for marketing the property at issue would be extended for another two years. *Id.* The court noted that the secured creditor originally lent funds to the debtor secured by 1,320 acres of land and bargained for its ability to foreclose on the land and to realize the value from all of the 1,320 acres in the event of a default by the debtor. *Id.* Additionally, the court recognized that if the creditor later sells the property at a value lower than that calculated by the bankruptcy court, the secured creditor would have no recourse to foreclose or attach to the remaining undistributed collateral that the debtor reclaimed. *Id.* Therefore, the Ninth Circuit found that the proposed partial distribution did not "insure the safety of or prevent jeopardy to the principal." *Id.*

18

The "indubitable equivalent" standard is stringent and the burden for establishing it is more than a mere preponderance. In fact, it is and is "akin to clear and convincing standard." *In re Prosperity Park, LLC*, 2011 WL 1878210 at *4 (Bankr. W.D.N.C. May 17, 2011)(citing to *In re B.W. Alpha, Inc.*, 100 B.R. 831 (Bankr. N.D. Tex. 1998)). Many courts have required substantial equity cushions to satisfy the "indubitable equivalent" standard. *In re Walat Farms, Inc.* 70 B.R. 330, 334 (1987) (doubting the court's ability to value the land beyond doubt when, the plan only provided for an approximate 16% equity cushion, when the secured claim was $589,000.00 and the land to be conveyed to the secured creditor totaled $700,000.00); *In re Prosperity Park*, 2011 WL 1878210 at *5 (Bankr. W.D.N.C. May 17, 2011) (denying confirmation of a plan where the creditor's secured claim totaled $430,280.09 and the creditors unsecured claim totaled $653,203.07 and the debtor proposed to convey a portion of its real property, which it valued at $663,410.00 in full satisfaction of the secured debt); *In re Atlanta S. Bus. Park, Ltd.*, 173 B.R. 444 (Bankr. S.D. Ga. 1994) (confirming a plan which proposed to convey only a portion of the secured property valued at $668,071.90, plus a cash payment of $144,886.00 in full satisfaction of the creditor's $663,150.23 claim.)

In the present case, clearly if the Court found value in accordance with the values suggested by Mr. Ingram and Mr. McNeill, the value of thirty-five (35) lots does not even equal the payoff of the claim of $1,450,000.00. Even under the Merritt appraisal, thirty-five (35) lots at $42,929.00 per lot or $1,502,515.00, does not meet the clear and convincing burden of proof standard for the indubitable equivalence of the $1,450,000.00 claim.

Is there some number of lots, less than seventy (70), that if surrendered to First Bank would equal the indubitable equivalent of First Bank's claim?[5] Here, it is doubtful. No lot sales have closed

---

[5]The Debtor's Plan proposes to convey approximately one-half of the collateral to First Bank. At the hearing, the Debtor alluded that a certain number of lots greater than the amount

in approximately two years.  The Property is surrounded by neighboring subdivisions which possess good amenities and marketing programs.  First Bank and its affiliates own over 1,000 vacant residential lots in Brunswick County.  Additionally, Lanvale Forest Subdivision, located within a three mile radius of the Property, is in the process of being deeded to First Bank in lieu of foreclosure.  Further, the Debtor is unable to fund the clubhouse and pool, making the subject subdivision less desirable to potential purchasers. The evidence indicates the value of the Property is far from certain.   The widespread variation in appraisal testimony, with a  low of $1,400,000.00 and a high of $3,370,000.00 for a differential in value of approximately $1,900,000.00, makes the valuation even less certain.

In this case, the large disparity in professionally appraised values demonstrates uncertainty in attempting to forecast the price at which the Property will sell.  Considering the three year absorption period relied upon by Mr. McNeill and Mr. Merritt and the four year rate of absorption as testified to by Mr. Ingram, the Court is doubtful lots could be absorbed at the projected rates considering the recessionary state of the American economy, the inability of buyers and builders to obtain financing without significant down payments, and the state of the market for residential subdivision lots in Brunswick County.  Based on all these factors, the Court finds that even Mr. Ingram's value may be too optimistic.  As a result, the court has significant doubts that its value of $25,000.00 per lot or $1,750,000.00 is reliable, much less being sufficiently accurate to be used to determine an indubitable equivalent calculation.  Too much variation in values and too much uncertainty in the market equals no indubitable equivalent.

---

proposed to be conveyed under the Plan could provide First Bank with the indubitable equivalent of its claim.  However, the Debtor has failed to make any modification to its Plan, and has not filed any written modification of Plan as required by 11 U.S.C. § 1127(a).

Therefore, the Court holds there are no amount of lots less than seventy (70), that if conveyed to First Bank, would satisfy the clear and convincing burden of proof standard required to make the Plan treatment to First Bank fair and equitable pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii).

Therefore, the confirmation of the Plan is **DENIED**.

**SO ORDERED.**

**END OF DOCUMENT**